UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| James Edward Whitley, a/k/a | ) | Case No. 10-10426 |
| Ed Whitley, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Charles M. Ivey, III, | ) | |
| Chapter 7 Trustee for the | ) | |
| Estate of James Edward | ) | |
| Whitley, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 12-02028 |
| | ) | |
| First-Citizens Bank and | ) | |
| Trust Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

This adversary proceeding came before the court on December 4, 2012, for hearing on the Defendant's motion to dismiss the Plaintiff's complaint pursuant to Rules 7012 and 7009 of the Federal Rules of Bankruptcy Procedure and Rule 12(b)(1) and (6) and Rule 9 of the Federal Rules of Civil Procedure. Justin W. Kay and Edwin R. Gatton appeared on behalf of the Plaintiff and Michael P. Flanagan and Gary J. Rickner appeared on behalf of the Defendant.

BACKGROUND

Prior to the commencement of this case, James Edward Whitley ("Debtor") purportedly was engaged in the factoring business. In reality, the Debtor's factoring business was non-existent and

fictitious and is described as a Ponzi scheme in the Plaintiff's complaint. The Debtor utilized a checking account located at First-Citizens Bank and Trust Company ("Defendant" or "First-Citizens") to make deposits and write checks in the course of his investment scheme. In March of 2010, a group of unsecured creditors filed a chapter 7 involuntary petition against the Debtor. Charles M. Ivey, III ("Plaintiff") was appointed as Trustee and subsequently commenced this adversary proceeding against the Defendant. Count I of the Plaintiff's complaint seeks recovery from the Defendant based upon an alleged civil conspiracy between the Debtor and the Defendant to commit fraud. Count II seeks to avoid allegedly fraudulent transfers of funds from the Debtor to the Defendant pursuant to section 548 or, alternatively, pursuant to section 544 and the North Carolina fraudulent transfer statutes. Count III is a claim for alleged unfair and deceptive trade practices ("UDTP claims") on the part of the Defendant in violation of N.C. Gen. Stat. § 75-1.1, et seq.

MATTER BEFORE THE COURT

The Defendant's motion seeks dismissal of the conspiracy claim (Count I) and the UDTP claim (Count III) pursuant to Rule 12(b)(1) on the grounds that the court lacks subject matter jurisdiction because the Plaintiff does not have standing to assert such claims. The Defendant seeks dismissal of the fraudulent conveyance claim (Count II) pursuant to Rules 12(b)(6) and 9(b) for failure to state

a claim upon which relief can be granted.

DISCUSSION

I. Plaintiff's Standing to Assert the Conspiracy
   and Unfair and Deceptive Trade Practice Claims

For the reasons that follow, the court has concluded that the Plaintiff lacks standing to prosecute the conspiracy and UDTP claims and that the Defendant's motion to dismiss should be granted as to Counts I and III.

Claims that the debtor held on the petition date are property of the bankruptcy estate and may be pursued by the trustee pursuant to section 704(a)(1) of the Bankruptcy Code. E.g., Polis v. Getaways, Inc., 217 F.3d 899, 901 (7th Cir. 2000). A chapter 7 trustee, however, does not have standing to assert claims that belong solely to creditors of the debtor. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). To the extent that there are claims against the Defendant for conspiracy or unfair and deceptive trade practices, they are claims that belong to creditors who have been harmed by the misconduct giving rise to such claims. See Neilson v. Union Bank of Cal., N.A., 290 F. Supp.2d 1101 (C.D. Cal. 2003). Such claims thus are not property of the estate in this case. The Plaintiff nonetheless maintains that he is entitled to assert the conspiracy and UDTP claims because such claims have been assigned to him by creditors of the Debtor. Based upon such assignments, the Plaintiff contends that he has standing to assert the claims. The

- 3 -

Defendant asserts that the assignments are ineffective to transfer the claims to the Plaintiff and that the Plaintiff therefore does not have standing to assert the claims.

A valid assignment of a claim to the estate is required in order for a trustee to step into the shoes of the creditor as an assignee and prosecute the claim for the estate's benefit.  See Williams v. Cal. 1st Bank, 859 F.2d 664, 666-67 (9th Cir. 1988); Logan v. JKV Real Estate Servs. (In re Bogdan), 414 F.3d 507 (4th Cir. 2005); Mixon v. Anderson (In re Ozark Rest. Equip. Co., Inc.), 816 F.2d 1222, 1228 (8th Cir. 1987).  Either through legislative enactments or judicial decisions, many states have imposed limits on the assignability of claims.  A critical issue raised by the motion to dismiss is whether such state law limitations are controlling in determining whether a state law claim can be assigned to a bankruptcy estate.

The Plaintiff relies upon Logan v. JKV Real Estate Servs. (In re Bogdan), supra, as authority for arguing that he has standing as a result of the purported assignments obtained from creditors of the Debtor.  This reliance is misplaced.  In Bogdan, the Fourth Circuit Court found that there is no "per se prohibition" against trustees prosecuting assigned claims.  Id. at 512.  However, the Court did not analyze the particular underlying assignments because the lower courts had not addressed their potential invalidity.  Id. at 510 n.1; id. at 517 (King, J. concurring and dissenting).

- 4 -

Bogdan thus does not provide the analysis required in determining whether a claim which belongs to a creditor can be assigned to a bankruptcy trustee.

The general rule followed in the Fourth Circuit is that "[f]ederal bankruptcy law looks to state law for definition of what interests are rights of the debtor or creditors of the debtor." Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132, 135 (4th Cir. 1988). Accordingly, in deciding whether an alter ego claim could be brought by the bankruptcy trustee, the court in Steyr-Daimler-Puch looked to state law. Id. ("The courts that have confronted the issue whether an alter ego claim can be brought by the trustee have accordingly looked to the nature of that claim under state law."). State law limitations on the assignability of state law claims are not preempted by the Bankruptcy Code and remain effective as "limitations imposed upon the debtor by applicable nonbankruptcy law." Integrated Solutions Inc. v. Serv. Support Specialties, Inc., 124 F.3d 487, 493 (quoting Am. Freight Sys., Inc. v. ICC (In re Am. Freight Sys., Inc.), 179 B.R. 952, 960 (Bankr. D. Kan. 1995)); see Grochocinski v. Crossman (In re Crossman), 259 B.R. 301, 307-08 (Bankr. N.D. Ill. 2001). Thus, in Integrated Solutions, the court held that state law was controlling in determining whether a state law claim could be assigned in a bankruptcy case. 124 F.3d at 492-93. Although the foregoing decisions do not involve the precise issue of whether state law

conspiracy and UDTP claims may be assigned to a bankruptcy trustee, they do convince this court that since the claims are state law claims, this court should look to state law, <u>i.e.</u>, North Carolina law, in determining whether such claims could be assigned to the Plaintiff in this proceeding.

The conspiracy to commit fraud and the UDTP claims are not assignable under North Carolina Law. As a general rule, causes of action may be assigned in North Carolina. <u>Investors Title Ins. Co.</u> <u>v. Herzig</u>, 413 S.E.2d 268, 271 (N.C. 1992). However, when a cause of action is personal in nature, an assignment violates public policy and will not be enforced. <u>Id.</u> More specifically, the North Carolina Supreme Court has held that claims for conspiracy to commit fraud and unfair and deceptive trade practice act violations are causes of action which are personal in nature and cannot be assigned. <u>Id.</u> ("[T]he assignment of such claims violates our public policy and will not be enforced.").

The Trustee seeks to distinguish <u>Investors Title</u> by asserting that the underlying rationale of the case, the importance of protecting consumers and the inequity of allowing a third party assignee to benefit from consumer protection legislation, <u>see id.</u> at 271-72, is inapplicable here because the assigning victims of the Debtor's Ponzi scheme will benefit from any recovery by the Trustee in this proceeding as creditors of the Whitley estate. However, the North Carolina prohibition against the assignability

of personal tort claims is grounded more generally in the importance of deterring champerty. See <u>Charlotte-Mecklenburg Hosp.</u> <u>Auth. v. First of Ga. Ins. Co.</u>, 455 S.E.2d 655, 657 (N.C. 1995); <u>Atl. Coast Mech., Inc. v. Arcadis, Geraghty & Miller of N.C., Inc.</u>, 523 S.E.2d 334, 338 (N.C. Ct. App. 2006). This policy is vindicated by treating the assignment of the conspiracy and UDTP claims as unenforceable in accordance with the decision in <u>Investors Title</u>.

The Plaintiff's attempt to invoke the doctrine of subrogation as providing him with standing to pursue the conspiracy to commit fraud and UDTP claims is unavailing. A plaintiff must allege a sufficient basis for standing in order to defeat a facial challenge to jurisdiction. <u>Apex Digital, Inc. v. Sears, Roebuck & Co.</u>, 572 F.3d 440, 444 (7th Cir. 2009). When adjudicating a facial challenge, the court assumes allegations in the complaint are true and then considers whether standing exists. <u>Id.</u> at 445. The complaint here fails to overcome the Defendant's facial challenge because it does not plead subrogation expressly and also fails to allege facts that would give rise to subrogation. The first mention of equitable subrogation, conventional subrogation, or the manner in which the claims were allegedly subrogated occurs in the <u>Trustee's Brief in Opposition to the Defendant's Motion to Dismiss</u>. The Trustee's complaint only asserts that "creditors of the estate have unconditionally assigned to the Trustee their rights to pursue

- 7 -

third parties including [the Defendant]." <u>Complaint</u> at 1.  The
complaint contains no other explanation of the transfer of rights
to the Plaintiff.  Asserting subrogation in a brief will not cure
a failure to plead it in a complaint.  <u>See</u> <u>Brewer Envtl. Indus.,</u>
<u>LLC v. Matson Terminals, Inc.</u>, Civ. No. 10-00221, 2011 WL 1637323,
at *16 (D. Haw. Apr. 28, 2011).  Therefore, subrogation does not
provide the Plaintiff with standing to pursue the civil conspiracy
or the UDTP claims.

   II.   The Remaining Claim for Fraudulent Transfers
         Is Not Subject to Dismissal

Under section 548(a)(1)(A), the trustee may avoid any transfer
of an interest of the debtor that was made within two years before
the date of the filing of the petition if the debtor made such
transfer "with actual intent to hinder, delay, or defraud" any
entity to which the debtor was or became indebted.  Section 550, in
turn, permits the trustee to recover fraudulently transferred
property or the value of such property from (1) the "initial
transferee" of the fraudulent transfer or the entity for whose
benefit such transfer was made; or (2) any immediate or mediate
transferee of the initial transferee.

Similar relief is available under North Carolina law.  N.C.
Gen. Stat. § 39-23.4 provides that a transfer made by a debtor is
fraudulent if the debtor made the transfer "[w]ith intent to
hinder, delay, or defraud any creditor of the debtor. . . ."  N.C.
Gen. Stat. § 39-23.8 provides for the recovery of a fraudulent

transfer from the "first transferee of the asset or the person for whose benefit the transfer was made or any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee."

In Count II of the complaint, the Plaintiff asserts that bank deposits made by the Debtor into a checking account maintained by the Debtor at First-Citizens are avoidable as fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code. Alternatively, the Plaintiff asserts that such bank deposits are transfers that may be avoided pursuant section 544 of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.4, etc. The Plaintiff alleges that First-Citizens is the "initial transferee" of such transfers and that such transfers therefore may be recovered from First-Citizens pursuant to section 550(a)(1) or N.C. Gen. Stat. § 39-23.8.

> A.    The Transferee Status of First-Citizens
>        Is Not Grounds for Dismissal

Although First-Citizens admittedly was the initial or first recipient of the funds referred to in the complaint, First-Citizens nonetheless asserts that Count II "fails" because "as a matter of law", First-Citizens was not the "initial transferee" of the transfers for purposes of section 550 or N.C. Gen. Stat. § 39-23.8. Motion to Dismiss, p. 13. In support of this argument, First-Citizens relies heavily upon the Fourth Circuit decision in Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties

Ltd. P'ship), 99 F.3d 151 (4th Cir. 1996).  In the Bowers decision, the Fourth Circuit Court adopted a "dominion and control" test for determining whether an entity is an "initial transferee" for purposes of section 550.  The court ruled that the minimum requirement in order for a recipient of an avoidable transfer to be the "initial transferee" is dominion over the property in the sense of having legal dominion and control of the property.  Id. at 156. The ruling in Bowers, however, does not mean that First-Citizens is not the "initial transferee" as a matter of law.

At this juncture, there is no basis for a determination that First-Citizens is not the "initial transferee" as a matter of law. The record to be considered at this point consists of the Plaintiff's complaint, which contains allegations that describe First-Citizens as a commercial bank at which the Debtor maintained a checking account that was used by the Debtor to conduct a fraudulent Ponzi scheme by making deposits into and withdrawals from the account.  To the extent that First-Citizens is contending that these allegations establish "as a matter of law" that First-Citizens cannot be regarded as the initial transferee of deposits/transfers from the Debtor, such contention is rejected. The fact that First-Citizens is an entity engaged in the banking business and that the transfers at issue involve deposits and withdrawals from a demand deposit account administered by First-Citizens in the course of its banking business is not conclusive on

the issue of whether First-Citizens may be treated as "initial transferee" under section 550(a)(1).  The applicable test for determining whether First-Citizens was the initial transferee of the funds deposited into the account is not so narrow and takes into account other considerations.  In decisions other than <u>Bowers</u>, which are discussed below, the Fourth Circuit has imposed an additional requirement before the dominion and control, or "conduit test" will relieve an initial recipient of liability under section 550.  This additional requirement demands that the initial recipient have proceeded in good faith with respect to the dealings and transactions in which the initial recipient received the transfers from the debtor.  Unless the initial recipient can demonstrate it acted in good faith, it cannot avoid being treated as the initial transferee.

In <u>Huffman v. Commerce Security Corp. (In re Harbour)</u>, 845 F.2d 1254, 1257 (4th Cir. 1988), the court dealt with a situation in which an individual contended that she should not be treated as the initial transferee of funds because she was only a conduit who received funds from the debtor solely for the purpose of transferring the funds to a third party.  In addressing this argument, the Fourth Circuit Court observed that the adoption of a "mere conduit" or "dominion and control" test for determining whether a recipient is the "initial transferee" of property represents a departure from a literal interpretation of section 550

on "essentially equitable grounds." <u>Id.</u>  Applying the axiom that
one who seeks equitable relief must itself have acted equitably,
the court concluded:

> But if a defendant who is the initial
> recipient of funds asks the court on
> essentially equitable grounds to declare that
> the defendant is not an "initial transferee"
> under section 550(a)(1), then clearly this
> defendant must not have acted inequitably,
> i.e., in bad faith.

<u>Id.</u>

Based upon a finding that the defendant had not acted in good
faith regarding the transaction in which she received funds from
the debtor, the court refused to treat the defendant as having been
a mere conduit and held the defendant should be treated as the
initial transferee of the funds and hence liable to the trustee.
In so holding, the court reiterated the good faith requirement,
stating:

> We look with approval on that line of lower
> court decisions which have recognized that the
> initial recipient of funds from a debtor may
> not always be an "initial transferee" within
> the meaning of 11 U.S.C. § 550(a)(1).  Since,
> however, the initial recipient is asking the
> court to ignore the literal meaning of section
> 550(a)(1) on essentially equitable grounds,
> this party must have acted in "good faith"
> with respect to the relevant transaction in
> order to be spared the effects of this code
> provision.  We find that Vivan Brandon did
> not, as a matter of law, act in "good faith"
> when she served as an intermediary in
> Harbour's transfer of $179,450.00 to James
> Brandon.  Even assuming that she did not know
> and did not ask why these funds were being
> processed through her, such wilful ignorance

> in the face of facts which cried out for
> investigation may not support a finding of
> good faith on her part.

Id. at 1258.

Although the initial recipient of funds in Huffman was an
individual, there is nothing in the opinion that suggests that good
faith would not be required if the defendant were a commercial
entity.  After noting that commercial entities were involved in
most of the earlier decisions in which the initial recipient of
funds was treated as a conduit and not an initial transferee, the
court stated: "And in the cases where the trustee's recovery was
denied there was no hint that the defendants' handling of the
debtor's funds in any way departed from their normal handling of
commercial transactions."   Id. at 1257.   And while the court
observed that the likelihood of bad faith is lessened where the
defendant is a commercial enterprise handling routine transactions,
the court never suggested that it would not matter if, in fact,
there was bad faith on the part of a commercial entity in handling
such transactions.  In the next sentence of the opinion the court
indicated that bad faith would make a difference even if the
defendant were a commercial entity: "In none of the cases above
where recovery was denied to the trustee was there a finding by the
court of bad faith on the party of the commercial defendant."  Id.

There was no allegation or evidence of bad faith on the part
of the defendant in the Bowers case and the court did not discuss

- 13 -

that issue or cite <u>Huffman</u> in the <u>Bowers</u> decision.   The court did discuss <u>Huffman</u> in <u>Bowers v. Kuse Enterprises, Inc. (In re Florida Hotel Properties Ltd)</u>, 172 F.3d 43, 1998 WL 957455, *4-5 (4th Cir. Sept. 22, 1998), which was decided after the decision in <u>Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties Ltd. P'ship)</u>, <u>supra</u>.   In <u>Kuse</u>, the defendant (who was sued as being the initial transferee) argued on appeal that the bank from whom he received a check should be treated as the initial transferee because of bad faith on the part of the bank.   In rejecting this argument because the defendant had produced no evidence to support the allegation of bad faith the court stated:

> Kuse's second argument is that the Bank acted in bad faith in its handling of the debtor's funds, and is therefore not eligible for the "mere conduit" exception to the strict application of § 550(a).   Kuse bases this argument on our decision in <u>Huffman v. Commerce Security Corp. (In re Harbor)</u>, 845 F.2d 1254 (4th Cir. 1998), in which we held that when an "initial recipient is asking the court to ignore the literal meaning of section 550(a)(1) on essentially equitable grounds, this party must have acted in 'good faith' with respect to the relevant transaction in order to be spared the effects of this code provision." <u>Id.</u> at 1258.   This case, however, is readily distinguishable from <u>Harbor</u> on its facts.

<u>Id.</u> at *4

In explaining how the two decisions were distinguishable the court stated: "The Bank here, in contrast to the defendant in <u>Harbor</u>, is a commercial entity that is in the business of issuing cashier's checks in the course of its normal commercial

- 14 -

transactions, <u>and Kuse has presented no evidence-other than the</u>
<u>allegations contained in the Trustee's complaint against the Bank-</u>
<u>that the Bank's issuance of the cashier's checks in question were</u>
<u>other than routine commercial transactions.</u>"  <u>Id.</u> at *5.  (Emphasis
added).  The court at no point in the opinion criticized the holding
in <u>Huffman</u> that an initial recipient who seeks to invoke the "mere
conduit" exception to section 550(a)(1) must have acted in good
faith.  In fact, the foregoing language distinguishing the two
decisions on the grounds that there was no evidence of bad faith in
<u>Kuse</u> reflects that <u>Huffman</u> remains viable and that it would have
made a difference in <u>Kuse</u> if there had been evidence of bad faith
on the part of the bank.

A further indication that <u>Huffman</u> remains good law is found in
<u>Goldman v. Capital City Mortgage Corp. (In re Nieves)</u>, where the
Fourth Circuit Court again cited <u>Huffman</u> favorably, stating that
<u>Huffman</u> had "addressed whether an initial transferee of avoided
property could be considered a 'mere conduit' outside the scope of
§ 550 altogether."  The court then stated:

> <u>Huffman</u> endorsed the idea that § 550 might not
> apply on equitable grounds to such an initial
> transferee when the transferee took in good
> faith.  <u>Id.</u> at 1258.  The initial transferee in
> <u>Huffman</u>, however, could not make out a showing
> of good faith because of her "wil[l]ful
> ignorance in the fact of facts which cried out
> for investigation."

648 F.3d at 239 (internal citations deleted).

Based upon the foregoing authorities, the court concludes that

- 15 -

whether First-Citizens may avoid being treated as the initial
transferee of the funds deposited by the Debtor on the theory that
it is a depository bank that lacked dominion and control over the
funds and was a mere conduit also depends upon whether First-
Citizens is able to show that it acted in good faith with respect
to its handling of the account utilized by the Debtor in conducting
his Ponzi scheme.  In accord Martinez v. Hutton (In re Harwell), 628
F.3d 1312, 1323 (11th Cir. 2010)("good faith is a requirement under
this Circuit's mere conduit or control test" and "initial
recipients . . . who seek to take advantage of equitable exceptions
to § 550(a)(1)'s statutory language must establish that (1) they did
not have control over the assets received, i.e., that they merely
served as a conduit for the assets that were under the actual
control of the debtor-transferor and (2) that they acted in good
faith as an innocent participant in the fraudulent
transfer.")(emphasis by the court).

As noted by the Fourth Circuit in Nieves, the Bankruptcy Code
does not provide a definition for good faith.  In addressing the
issue of good faith, the Fourth Circuit first ruled that good faith
under section 550[1] should be determined under an objective standard.

_____

[1]The court adopted the same objective standard for all
transferees under section 550.  After noting that an objective
standard had been adopted in Huffman for initial transferees, the
court stated that "[t]he good faith standard applicable to
immediate and mediate transferees should be the same as the good
faith standard for initial transferees.  Id. at 239.

Nieves, 648 F.3d at 238.  The court stated that in applying this standard, "courts should analyze what the transferee 'knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.'"  Id.  "However, . . . what the transferee should have known depends on what it actually knew, and not what it was charged with knowing on a theory of constructive notice."  Id.  Whether a transferee should have inquired or investigated a transfer thus depends upon the facts that were actually known by the transferee when the transfer was received.  Id. at 241.  (decision by trial court that transferee's duty to investigate depended upon "facts known to [transferee]" was a correct application of the objective good faith standard)(emphasis in original).  These considerations led the court to conclude that in the case of a business entity "the objective good-faith standard probes what the transferee knew or should have known . . . taking into consideration the customary practices of the industry in which transferee operates."  Id. at 239-40.  Such an analysis "looks to routine business practices to set the objective good-faith standard. . . ."  Id. at 239 n.4.  According to the court, this approach to defining good faith "gives an industry wide latitude in which to operate, so long as it follows the very customs the industry itself has created."  Id. at 239.  This means that the routine business practices of the banking industry will be central in determining whether First-Citizens acted in good faith with

regard to its handling of the checking account utilized by the Debtor. However, apart from the impact of industry standards in assessing good faith where the transferee is a business entity, there is an additional, perhaps more fundamental, component of good faith which the court in Nieves described as "honesty in fact." Id. ("'Good faith' thus contains both subjective ('honesty in fact') and objective ('observance of reasonable commercial standards') components."). Under this component, good faith, whether the transferee is a business entity or an individual, requires that the transferee have acted "honestly." Id. At the very least, this means that the transferee claiming good faith must have acted without improper motive and certainly without actual knowledge of the debtor's fraud.

It is true that dismissal may be granted if all of the facts necessary to support a dismissal appear on the face of the complaint. See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007). This rule, however, is not applicable in this proceeding because the facts alleged in the complaint do not establish that First-Citizens meets the foregoing standard for determining good faith. To the contrary, there are factual allegations in the Plaintiff's complaint that dispute good faith on the part of First-Citizens, including the following: the Debtor had an earlier account at First-Citizens which he used in conducting an earlier stage of his Ponzi scheme. First-Citizens became suspicious

regarding the Debtor's use of the earlier checking account and conducted an investigation. The investigation included an interview with the Debtor in which the Debtor was evasive when asked to explain the transactions involving his account and left the Bank's questions regarding the account unanswered.   Based upon its investigation, First-Citizens closed the Debtor's account in January of 2007, noting that "We fear that Mr. Whitley is involved in some kind of Ponzi Scheme."   Complaint, p. 6.   Despite having closed the Debtor's account under these circumstances, in March of 2008, a little over a year later, First-Citizens allowed the Debtor to open another checking account, which the Debtor then used in order to make deposits and withdrawals involved in his Ponzi scheme from March of 2008 until March of 2010.   After the new account was opened, First-Citizens again noted suspicious activity involving the Debtor's new account and again began monitoring the account.   The suspicious activity included the immediate movement of funds once items were deposited into the Debtor's account.   During June of 2008, First-Citizens increased its monitoring of the account as a result of the high velocity funds and wires involving the account. Despite the suspicious activity involving the Debtor's second account and the prior history in which the Bank had concluded that Debtor might be involved in "some kind of Ponzi Scheme", First-Citizens took no action to close the account and the Debtor continued to use the account to conduct his Ponzi scheme until March

of 2010 when his Ponzi scheme came unraveled and he was placed in bankruptcy.  The court therefore declines to conclude as a matter of law that First-Citizens was not the initial transferee of the funds deposited by the Debtor in the account at First-Citizens.

      B.   Count II Meets the Requirements of
           Rules 12(b)(6) and 9(b) and States a
           Claim for Fraudulent Transfers

First-Citizens also argues that Count II should be dismissed pursuant to Rules 12(b)(6) and 9(b) for failure to state a claim upon which relief can be granted.  These provisions operate in tandem when a claim is based upon actual fraud on the part of the defendant.  The requirement under Rule 12(b)(6) is that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  A motion to dismiss should be considered using a two-pronged approach.  <u>Iqbal</u>, 129 S.Ct. at 1950. First, a court must accept as true all factual allegations contained in a complaint.  <u>Id.</u> at 1949.  Once a court assumes the truth of well-pleaded factual allegations, it should "then determine whether they plausibly give rise to an entitlement to relief."  <u>Id.</u>  In order for a claim to be facially plausible, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must

demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949 (citing Twombly, 550 U.S. at 556). Whether a complaint states a plausible claim for relief will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. In addition to meeting the plausibility standard of Iqbal, fraud-based claims must be pleaded with particularity pursuant to Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Applying these standards in the present case, the court concludes that the Plaintiff's complaint does state a claim for the recovery of fraudulent transfers and that the motion to dismiss should be denied to extent that it seeks dismissal of Count II pursuant to Rule 12(b)(6).

In order to state a claim for relief under section 548(a)(1)(A), the Plaintiff must show that First-Citizens received a transfer of an interest in property of the Debtor. The allegation in the Plaintiff's complaint that the Debtor deposited funds into the bank account at First-Citizens is sufficient to allege that transfers were made from the Debtor to First-Citizens. A transfer is defined in section 101(54)(D) of the Bankruptcy Code as including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." Consistent with this very broad

definition, the deposit of funds into a bank account constitutes a transfer of such funds.  E.g., Ward v. Jenkins (In re Jenkins), No. 12-5033, 2012 WL 6186347, at *4 (Bankr. W.D.N.C. Dec. 12, 2012); In re Pulliam, 279 B.R. 916, 920 (Bankr. M.D. Ga. 2002).

Moreover, even if the Plaintiff's complaint is read as alleging that the funds deposited with First-Citizens were obtained fraudulently, the Plaintiff's complaint nonetheless satisfies the requirement under section 548(a)(1)(A) that the transfers involve property of the Debtor.  Transfers made by the operator of a Ponzi scheme may be recovered under section 548(a)(1), despite the fact that the funds were procured through fraud.  In Sender v. Buchanan (In re Hedged-Investments Assocs., Inc.), 163 B.R. 841 (Bankr. D. Colo. 1994), subsequently aff'd, 84 F.3d 1286 (10th Cir. 1996), the debtor made transfers from his personal checking account to investors.  The court held that these transfers constituted transfers of an interest of the debtor in property, notwithstanding the fact that the funds were initially fraudulently procured from investors.  Hedged-Invs., 163 B.R. at 850.  In the absence of an agreement between the parties that the funds were to be held in trust or other such proof that the funds were held in trust, the funds were property of the debtor.  Id. at 850-51; see also In re AppOnline.com, Inc., 315 B.R. 259 (Bankr. E.D.N.Y. 2004).  The Tenth Circuit held in Bailey v. Big Sky Motors, Ltd. (In re Ogden), 314 F.3d 1190, 1198 (10th Cir. 2002), that a chapter 7 debtor, in his

- 22 -

role as operator of a Ponzi scheme, had at least defeasible title in funds that he fraudulently acquired from subsequent investors for the purpose of making payment to earlier ones. Accordingly, the operator's payment on account of this prior investor was one involving an "interest of the debtor in property," within the meaning of the preference provision. Ogden, 314 F.3d at 1198. The Plaintiff's complaint alleges that the Debtor was able to convince individuals to loan or advance money to him by means of checks or wire transfers payable or directed to the Debtor individually and that he deposited or caused such checks and wire transfers to be deposited into his bank account at First-Citizens. These allegations are sufficient to satisfy the first element of section 548(a)(1)(A).

The second requirement that must be shown by the Plaintiff is that the transfers were made on or within two years before the date of the filing of the bankruptcy petition for purposes of a claim under section 548(a)(1)(A) or, for purposes of a claim under N.C. Gen. Stat. § 39-23.4(a)(1), that this action was brought within four years from the date of the transfer or, if later, within one year after the transfer could reasonably have been discovered. N.C. Gen. Stat. § 39-23.9. The complaint alleges that the bank account involved with the transfers that the Plaintiff seeks to avoid was opened in March 2008. The complaint further alleges that the Debtor ran his Ponzi scheme through this account by depositing checks and

wire transfers that he obtained into this account. The complaint further alleges that all of the deposits into the account were fraudulent conveyances and seeks the avoidance of all such transfers. The petition in the Debtor's case was filed on March 8, 2010. The transfers to First-Citizens thus occurred within the Code's two-year period or within the four-year look back period under N.C. Gen. Stat. § 39-23.9. The Plaintiff therefore has sufficiently pled the second element of a claim for a transfer made with actual intent to hinder, delay or defraud creditors.

The Plaintiff's allegations also state a claim under both the Bankruptcy Code and North Carolina law that the Debtor made the challenged transfers with actual intent to defraud. The complaint sets out facts intended to describe the existence of a Ponzi scheme. A majority of federal courts have held that proof of operation of a Ponzi scheme is sufficient to establish actual intent to hinder, delay, or defraud creditors so as to permit avoidance as a fraudulent transfer under section 548(a)(1)(A).[2]   Transfers in

---

[2] See, e.g., In re Grafton Partners, 321 B.R. 527. 532 (B.A.P. 9th Cir. 2005); Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.), 916 F.2d 528, 536 (9th Cir. 1990); Emerson v. Maples (In re Mark Benskin Co., Inc.), 1995 WL 381741, at *5 (6th Cir. 1995); Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 305 (S.D.N.Y. 2010), In re Bernard L. Madoff Inv. Secs. LLC, 445 B.R. 206, 220-21 (Bankr. S.D.N.Y. 2011); In re Taneja, 453 B.R. 618, 621 (Bankr. E.D. Va. 2011); Liebersohn v. Campus Crusade for Christ, Inc. ( In re C.F. Foods, L.P.), 280 B.R. 103, 110 (Bankr. D. Pa. 2002); Jobin v. Ripley  (In re M & L Bus. Mach. Co., Inc.), 198 B.R. 800, 806-07 (D. Colo. 1996).

furtherance of a Ponzi scheme "have achieved a special status in fraudulent transfer law" from which intent of actual fraud may be inferred. In re Cohen, 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996). A Ponzi scheme is defined as:

> [A] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, [usually] without any operation or revenue-producing activity other than the continual raising of new funds.

BLACK'S LAW DICTIONARY (8th ed. 2004). By its very nature, a Ponzi scheme will eventually collapse. Perpetrators therefore know that the investors at the end of the line will lose their investment. Martino v. Edison Worldwide Capital (In re Randy), 189 B.R. 425, 438 (N.D. Ill. 1995) (citation omitted). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, Cf. RESTATEMENT (SECOND) OF TORTS, § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." Merrill v. Abbott (In re Indep. Clearing House Co.), 77 B.R. 843, 860 (D. Utah 1987).

This court finds that the "Ponzi scheme presumption" similarly arises in fraudulent transfer actions brought under section 39-23.4(a)(1) of the North Carolina Fraudulent Transfer Act. This issue has not been decided by the North Carolina courts. This court therefore will look to the interpretation of the Uniform Fraudulent Transfer Act in other jurisdictions, since the North Carolina

statute is to be "applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this Article among states enacting it." N.C. Gen. Stat. § 39-23.11. See also Terry v. June, 432 F. Supp. 2d 635, 639 (W.D. Va. 2006) (employing similar statutory analysis). Consistent with federal case law, courts with fraudulent transfer statutes similar to North Carolina's have held that the presumption of actual fraud applies in fraudulent transfer actions brought against perpetrators of Ponzi schemes. See, e.g., In re AFI Holdings, 525 F.3d 700, 704 (9th Cir. 2008) ("the mere existence of a 'Ponzi scheme' is sufficient to establish actual intent under section 548(a)(1) or a state's equivalent to that section.") (quoting Hayes v. Palm, 916 F.2d at 535); In re Mortg. Store, Inc., Slip Copy, 2011 WL 3878355, at *2 (Bankr. D. Hawai'I Sept. 1, 2011) ("Evidence that the Debtor operated a Ponzi scheme proves fraudulent intent . . . The transfer is fraudulent under 11 U.S.C. § 548(a)(1) and Haw.Rev.Stat. § 651C-4(a)."); In re Dreier LLP, 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011) ("Applying the Ponzi scheme presumption, the Complaint here sufficiently pleads the transferor's actual fraudulent intent. Therefore, the motion to dismiss Count III—actual fraudulent conveyance under NYDCL § 276—is denied.").

This court's decision to apply a presumption of actual fraud under the North Carolina Fraudulent Transfer act is further supported by federal case law. The Ninth Circuit has reasoned that

where a state statute is similar to the Bankruptcy Code, cases analyzing the Bankruptcy Code provisions are persuasive authority. AFI Holdings, 525 F.3d at 703. Indeed, several courts have looked to cases interpreting section 548 in order to give meaning to state statutes. See, e.g., PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.), 128 Fed.Appx. 839, 847 (3d Cir. 2005) ("We need not discuss the [actual-intent fraudulent transfer] provisions of the Delaware Fraudulent Transfer Act . . . because they are substantially the same as the relevant parts of the Bankruptcy Code."); ASARCO LLC v. Ams. Mining Corp., 396 B.R. 278, 365 (S.D. Tex. 2008) ("Thus, although ASARCO has not brought an action under section 548, the Court may look to cases interpreting actual-intent fraudulent transfer provisions of the Bankruptcy Code to predict the standard that would be applied. . ."). North Carolina's fraudulent transfer statute is similar in form and substance to the Bankruptcy Code's fraudulent transfer provisions. Compare 11 U.S.C. § 548(a)(1)(a) with N.C. Gen. Stat. § 39-23.4 (allowing a transfer to be avoided when the debtor acted with "actual intent to hinder, delay, or defraud" an entity or creditor). The substantial body of federal case law applying a presumption of actual fraud in section 548 fraudulent transfer actions arising from a Ponzi scheme is therefore persuasive authority. Consistent with this case law, the presumption should likewise arise under the North Carolina statute.

Plaintiff's allegations are sufficient to plausibly establish

the existence of a Ponzi scheme and thereby trigger a presumption of actual fraud.  As defined by the Fourth Circuit, a Ponzi scheme is "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors." U.S. v. Godwin, 272 F.3d 659, 666 n.3 (4th Cir. 2001).  To prove that a Ponzi scheme exists, a plaintiff must prove that (1) deposits were made by investors, (2) debtor conducted little or no legitimate business operations as represented to investors, (3) debtor's purported business operation produced little or no profits or earnings, and (4) source of payments to investors was cash infused by new investors.  In re Norvergence, Inc., 405 B.R. 709, 733 (Bankr. D. N.J. 2009); In re Pearlman, 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010).  Plaintiff's allegations satisfy all four requirements for a Ponzi scheme: (1) individuals transferred funds to Debtor for the purpose of investing in the factoring programs, (2) Debtor was conducting very little or no actual commerce or legitimate commercial activities, but represented that he was conducting legitimate business operations, (3) no actual profits or earnings were produced in any material fashion from the operation of the fictitious factoring program, and (4) to the extent that any alleged profits or returns were made on the investments, they were funded through additional funds obtained from additional investors into the fictitious factoring program.  Taken together, these facts set out a plausible claim that Debtor's activities constituted a

Ponzi scheme.   Plaintiff therefore has successfully invoked the "Ponzi presumption" under which payments made in furtherance of such a scheme are presumed to be fraudulent.

As previously noted, a claim for actual fraudulent transfer under the Bankruptcy Code also must satisfy Rule 9(b), which requires that averments of fraud be pleaded with particularity. Westinghouse Savannah River Co., 176 F.3d at 784.   In order to satisfy Rule 9(b), a complaint seeking to recover for actual fraudulent transfers must state with particularity the factual circumstances constituting the alleged fraud.   See In re Derivium Capital, LLC, 380 B.R. 429, 439 (Bankr. D.S.C. 2006) (citing In re Verestar, Inc., 343 B.R. 444, 459 (Bankr. S.D.N.Y. 2006)); In re Caremerica, 409 B.R. 737, 755 (Bankr. E.D.N.C. 2009).   Generally, to do this, the complaint must allege (1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfers and (3) the consideration paid with respect thereto.   In re Saba Enters., Inc., 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009). However, in applying Rule 9(b), a court should keep in mind the liberal pleading approach of Rule 8.   Michaels Bldg. Co. V. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988).   As the court explained in Michaels:

> Rule 8 requires a "short and plain statement of the claim" and calls for "simple, concise, and direct" allegations.   Indeed, Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather the two rules must be read in harmony.   Thus,

> it is inappropriate to focus exclusively on the
> fact that Rule 9(b) requires particularity in
> pleading fraud.  This is too narrow an approach
> and fails to take account of the general
> simplicity and flexibility contemplated by the
> rules.

Id.  In accord Gilbert v. Bagley, 492 F.Supp. 714, 725 (M.D.N.C.

1980)(Rule 9 "does not contradict the theory of notice pleading

embraced by the Federal Rules in general, and Rule 8, in

particular."). "Rule 9(b)'s requirement is not intended to be an

insurmountable hurdle for claimants to overcome; the complaint must

give the party adequate notice of the charges—it need not marshall

all of the evidence against him." Sharp v. Chase Manhattan Bank

USA, N.A. (In re Commercial Fin. Servs., Inc.), 322 B.R. 440, 448

(Bankr. N.D. Okla. 2003).  Consistent with this premise, the Fourth

Circuit has held that courts "should hesitate to dismiss a complaint

under Rule 9(b) if the court is satisfied (1) that the defendant has

been made aware of the particular circumstances for which [the

defendant] will have to prepare a defense at trial, and (2) that

plaintiff has substantial pre-discovery evidence of those facts."

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th

Cir. 1999); accord Fulk v. Bagley, 88 F.R.D. 153, 164 (M.D.N.C.

1980).  Applying these principles in the present case, the court is

satisfied that the Plaintiff's complaint satisfies the requirements

of Rule 9(b).

   In the present proceeding, there is a single Debtor and the

allegations in the complaint make it clear that all of the transfers

sought to be avoided were made by the Debtor by causing checks and wire transfers to be deposited into the Debtor's checking account at First-Citizens. Complaint, p. 4. Thus, the transferor of the challenged transfers is identified. These allegations also identify First-Citizens as the initial transferee of the challenged transfers. Complaint, p. 12. The complaint describes the manner in which the disputed transfers were made through the allegations that the deposits were made by the Debtor depositing checks into his checking account and causing wire transfers to be directed to his checking account. Complaint, p. 3. While the complaint does not specify the amount of each deposit/transfer nor give the date of each deposit/transfer, under the circumstances of this proceeding, the complaint nonetheless satisfies the requirements of Rule 9(b). The complaint alleges that _all_ of the deposits made into the Debtor's checking account from March of 2008 until March of 2010 were transfers made by the Debtor with the intent to defraud his creditors. Complaint, p. 12. First-Citizens thus is not left to guess about which among a number of deposits/transfers are at issue because the complaint informs First-Citizens that all of the deposits that went into the Debtor's checking account during the specified time period are being challenged as fraudulent transfers. The dates and amounts of the deposits/transfers that were made during the specified time period are available and known to First-Citizens from its own records. The requirements of Rule 9(b) may

be relaxed when a plaintiff alleges facts particularly within the knowledge of the defendant. <u>Michaels Bldg. Co. V. Ameritrust Co., N.A.</u>, 848 F.2d 674 (6th Cir. 1988). This principal has been applied in bankruptcy cases when, as in the present proceeding, a trustee is bringing the claim and, initially, has only second hand information to rely upon in alleging a claim based upon fraud. <u>See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)</u>, 321 B.R. 128, 140 (Bankr. D. Del. 2005); <u>Official Comm. Of Unsecured Creditors v. ASEA Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.)</u>, 288 B.R. 484, 495 (Bankr. N.D. Ohio 2003). As explained by the court in <u>James River Coal</u>, the particularity requirements of Rule 9(b) are more relaxed in the case of a fraudulent transfer action brought by a bankruptcy trustee. 360 B.R. at 163 n.15; <u>see also In re Rave Commc'ns., Inc.</u>, 138 B.R. 390, 395-96 (Bankr. S.D.N.Y. 1992); <u>In re Art & Co.</u>, 179 B.R. 757, 764-64 (Bankr. D. Mass. 1995). The purpose of Rule 9(b) is not to create a checklist of information that is required in every case, but, instead, is to be applied on a case-by-case basis in a manner that ensures that "the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial. . . ." <u>Westinghouse Savannah River Co.</u>, 176 F.3d at 783. The complaint is this proceeding satisfies this requirement and thus is not subject to dismissal for failure to comply with Rule 9(b).

CONCLUSION

In accordance with the foregoing findings and conclusions, an order shall be entered pursuant to Bankruptcy Rule 7052 granting the Defendants' motion to dismiss as to Counts I and III and denying the motion to dismiss as to Count II.

This 7th day of February, 2013.

_____
WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST

Edwin R. Gatton, Esq.
Charles M. Ivey, III, Esq.
Justin W. Kay, Esq.
P.O. Box 3324
Greensboro, NC 27402

Benjamin E.F.B.Waller,Esq.
Gary J. Rickner, Esq.
Michael P. Flanagan, Esq.
Ward and Smith, P.A.
P.O. Box 8088
Greenville, NC 27835-8088

Michael D. West, Bankruptcy Administrator